And move to the second case this morning, Bator v. District Council 4. Mr. Rebels, may it please the court, I am Thomas Rebels on behalf of the plaintiffs. We're here today regarding the dismissal of the plaintiff's complaint under Rule 12b-6 for failure to state a claim. The plaintiff's complaint alleged a breach of fiduciary duty against two defendants, defendant trustees, and the defendant union. At issue is the contribution rate to the fund and how that is applied. There is no dispute that the fund is underfunded. There's no dispute that the plaintiffs were members of the fund. The fund itself is a defined benefit plan that's unique in that it's distinct from the vast majority of plans generally found under arrest litigation, and that's not a traditional employer-funded plan. It's completely self-funded by the members. Here the plaintiffs were members. The plaintiffs bear the burden of any shortfall, as opposed to the majority of arrested funds where the employer would. And here the plaintiffs share in the pool of assets, and they've regularly been held responsible and forced to cover shortfalls through increased contributions and decreased benefits. As a result of the unique nature of the fund, there's a dearth of case law that's factually on point. The funding of the fund is at issue. The lower court concluded that the trustees had discretionary authority to interpret the governing documents, the trust indenture, to allow pre-approved segments or groups to contribute at different rates. Plaintiff's contention has always been that all members of the union had to contribute at the same rate that they were mandated to contribute. How do we get here? How do we reach that conclusion? We reach that because there's two articles of the trust indenture at issue. Article 3, which defines participation in the fund, and Article 4, which concerns contributions to the fund. Both articles, when examined together, confirm the plaintiff's contention. The trust indenture does not provide for different segments or groups to contribute at different levels. The trust indenture provides that all members of the union must contribute at the same rate if their membership had voted to increase contributions. That happened here. It's undisputed. In July of 2008, local 458 membership, as a whole, the entire membership, voted to increase their contribution rate to 8%. Article 4, Section 1C of the trust indenture, sets an initial contribution rate of $5 per pay period. I'm sorry. Article 4, 1C, allows that members can vote to increase their contribution level. If that is the case, it contains mandatory language that that must apply to all members. That's what happened here. That's the crux of the issue. The defendant, trustees, and the union argue, in line with the lower court's decision, that the trust indenture allows segments or groups to participate. However, the record doesn't show, there's no evidence in the record that segments or groups were allowed to participate. The complaint clearly spells out, and the union admitted in their answer to Paragraph 39 of the complaint, that on January 1, 2018, the members voted to increase their contribution rate. The complaint alleges, and the union admitted, that they held, quote, membership meetings, end quote, at which members, end quote, voted on various issues, including proposed changes to, quote, members, end quote, contributions. Both defendants admit that they needed a membership vote to cut benefits and increase contributions. That's found at Paragraph 41 of the complaint. The complaint alleges, and the union admitted in their answer, that per the bylaws of the union, all members, again, we're dealing with the term members, of the local are required to become participating members of the pension fund. The complaint alleges the union admits that the president of District Council 4, part of the union, sent a letter that stated local 458's, quote, membership, end quote, would have to approve a decrease in accordance with the bylaws. There's many more instances, I'm not going to belabor the court, but clearly membership means local 458M. It's the entire, the entirety of the union. There's only one group here, and that's local 458M, to which the plaintiffs belong. The lower court found that the trust indenture could reasonably be interpreted to allow different segments or groups to participate, but it's critical to note that Article III, Section 2, only uses the word segments, it's the first time we see it, and it only refers to the fund participation. So a union can participate in the fund in segments, but it doesn't say that the union can contribute in segments. Article III, Section 2, simply confirms a union could have different segments of its union participate in the fund, where each segment is formed from a different industry represented by the union. So for example, if a local participating union, and I apprised the court, there's 69 local participating unions in the fund, if a local union represented, say, bindery workers, lithographers, and pressmen, that union could participate based on those different, those are different industry segments. So the pressmen may come into the fund, the lithographers may not want to. Okay. Regarding Article IV and contributions, Article IV explains how the increases in fund contributions are made, and it established that once a union's membership, not various segments, not various groups, vote to increase their contribution, that should apply to all members. It employs mandatory language, it specifically provides without exceptions that once the membership voted to determine higher contribution rate, that formula should be applied to all participating members of the local union. That didn't happen here. How do we know that didn't happen here? Well, we know that both defendants, I'm sorry, we know that the plaintiffs pleaded that there was in fact groups, local 458 members, who were not contributing at the 8% rate. They were employed by a company called the Royal Fast Print. In the answer, the union admitted that the members of Royal Fast Print were not paying at the 8% contribution rate. So we actually have evidence on the record that this is not being applied to all members, exactly as the plaintiffs contend. The plaintiffs' interpretation of Article IV, it's also further supported and corroborated by the language in the summary plan description, and that acknowledges mandatory participation, it provides that once a proper group has voted to participate in the fund, all eligible members of that group are required by the bylaws of their local union to become and remain participants in the fund. And then we go to Article 14.2B of the union, that again cooperates, that states that, quote, all members of the local must become participating members of the pension fund. So below, the court examined the fact that Article IV and Article III language employed different terms and weren't necessarily in accordance. Article IV employs the undefined term, any group of participating members, while failing to employ the word segment or segments used in Article III. In order to rectify that disparity, the defendants argued, and the lower court agreed with, that Article X, Section 6 of the trust indenture is a grant of discretionary authority of the trustees to interpret the terms. In rendering its decision below, the court noted there was confusion regarding the language, but they felt Article IV could be clearer, but it held the trustees' interpretation, their discretion, was neither arbitrary nor capricious. Plaintiffs contend that we don't even need to get to that point of their discretionary authority because the language is clear in the governing document that all members must pay the increased contribution rate. The trustees can't rely on their discretionary authority to interpret the terms of the trust. They're using it as like a retroactive shield to evade their fiduciary duty to ensure the fund receives all the monies to which it's entitled. Trust documents, the law provides trust documents cannot excuse trustees from their duties under The trust documents must generally be construed in light of reversal policies that central state, southeast, and southwest areas pension fund, the essential transport, 472 U.S. 559, 1985. Moreover, any grant of discretion that the trustees would have to interpret these terms is not absolute. The court ultimately determines the duties and powers of a trustee by the rule of law that are applicable to the situation in terms of the trust as the court may interpret them. That's a higher stone, 49 U.S. 112. So the trustees obviously have a fiduciary duty to ensure that all the funds owed to the fund would do them. The trustees could not have abdicated that duty to collect their monies through inaction, ignorance, or reliance upon the union, but that is precisely what happened here. It's undisputed that the trustees acknowledged in their memo and admitted in their answer that the fund does not monitor or police the local unions, that the fund simply receives a list of participants and contribution rates from the union, and they take the union's word for it, that all who are required to participate are doing at the required rates. Plaintiffs allege that the facts here are very similar to a Second Circuit case. This is one of the only cases I find that's very similar factually, is it didactically Kazitsky and Sons Contractors Incorporated, 874 Federal 2nd, 192, 1989, and we believe that's an instructive case. In didact, the court considered whether trustees breached their fiduciary duty when they failed to collect delinquent contributions from non-union workers, relying upon employer and shop's steward records that ignored those numbers. The court there reasoned that the trustees' new or feasible investigation could have discovered that the reports were inaccurate. Relying upon the central states case, didact found the trustees' failure to collect the contributions was a breach of their fiduciary duty to act to ensure that a plan receives all funds to which it's entitled, and we know that one of the fundamental common law duties of a trustee is to preserve and maintain assets, and a trustee is expected to use reasonable diligence to discover the location of the trust property and to take control of it without unnecessary delay, and that's from central states. Further, ERISA law provides, under reporting disclosure standards, that a plan's knowledge of participants' identities must ensure, should know the participants' identities and trustees must ensure the prompt fulfillment of those contribution obligations. So clearly here, the governing documents of the trust mandate that since the vote was increased to 8%, it should apply to all members of the union. We have evidence here that it didn't. It applied to our plaintiffs. This came to light because our plaintiffs discovered that they were paying at the 8% rate, and new members were coming into the union, and they were not paying at the 8% rate, or they weren't paying at all. Some were told they had to participate in the union, some were told they weren't. So clearly the trustees breached their fiduciary duty. Now, in regards to the union as a defendant, the union is not a named fiduciary. The plaintiff's contended that it was a functional fiduciary, and that the union failed to set the contribution levels and gather the contributions in accordance with the bylaws. The lower court's holding ignored the complaint alleged that the membership set the contribution level. The membership set the contribution levels by their vote. So it was set at 8%. So there's no argument that the union was performing a settler function or they were setting the rate. The rate was set by the membership. Now, the union got involved and exercised authority to manage control of the fund because, as we know, as they admitted, the trustees deferred and left everything to the union. The union was going to send them who was participating, how they were participating, at what amounts. So the union received the funds from the plaintiff's employers, and then they forwarded those funds on to the trust. Plaintiffs rely on case law that states once employer contributions are removed, they become planned assets. So at this point, the union now has control of planned assets and they're acting as a functional fiduciary of the fund. The union arbitrarily determined who was going to contribute, at what amount, and then they acted as the intermediary between the employers and the fund by collecting or also failing to collect, and then remit the contributions over to the fund. Plaintiffs also alleged the union acted as a functional fiduciary by selecting and enforcing its bylaws and failing to collect the 8% contribution rate from all its members, including those employed by Aurora Fast Print, and that's found in the complaint at paragraph 74, 77, 93, and 94. This fact is undisputed, as the union admitted that Aurora Fast Print initially contributed $10 per pay period, then increased that to 5% of its gross weekly wages, and that's found in complaint paragraph 77, the union's answer at 77. So the plaintiff's contention that when determining who participated at what levels of contribution, the union acted as a functional fiduciary, because the law informs us that a person's fiduciary with respect to a plan, to the extent he exercises any discretionary authority or discretionary control respecting management of such a plan, or exercises any authority or control respecting management or disposition of its assets, or he has any discretionary authority or discretionary responsibility in the administration of such a plan. So in the absence of the trustees ensuring that the contribution rates are current, that the members are current, they're contributing at their proper rate, the union took on that job, essentially rendering them a functional fiduciary. If the court has no questions, I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you. Thank you. Mr. Kennedy? Good morning. My name is Tom Kennedy. I'm representing the Pele Trustees. My colleague, Wesley Kennedy, no relation, is representing the union on this appeal. In listening to the presentation by my colleague, I think he identified the cardinal problem with their analysis. He characterized the union's bylaws as a governing document of the pension fund. That is simply not the case. The fund's governing document is the trust agreement, which also functions as the plan document, and the summary plan description, both of which are attached to our submission as item one in our appendix. The problem with the plaintiff's case is that they don't acknowledge, let alone seek to satisfy, any obligation to demonstrate that the trustees have acted in an arbitrary and capricious manner. The appellants argued for the first time in their reply brief that the Firestone arbitrary and capricious standard is limited to cases involving benefit contributions. In fact, this circuit and others have long recognized that when trustees are construing the terms of a plan, the arbitrary and capricious standard applies if the plan establishes a discretionary review by the trustees. It's very clear and certainly undisputed in this case that Article 10, Section 6 provides the trustees with discretionary authority to construe the terms of the plan and is clear that, quote, the interpretation by the trustees of these documents or any provision thereof shall be final and conclusive, and goes on. So there's really no doubt that the plan itself has reserved the discretionary ability of the trustees to construe the terms of the plan, and if you examine the nub of the complaint, which is that the trustees allowed unions to establish different standards for participation, different amounts of contributions for differing groups, that opportunity to do that is specifically provided for in the plan. Article 3, Section 2, states that a local may be a participating local with respect to one or more segments of its membership or under separate conditions with respect to each of one or more segments, which is just another way of saying they can establish different rates of contributions for different groups. The plaintiffs argue that because there's language in the bylaws of Local 458 requiring a uniform level of contribution for that local union that that is in some way a burden that is shifted to the trustees. Obviously, my colleague will respond on behalf of the union, but from the point of view of the trustees, the trustees have always been clear and open about this. The obligation to determine the amount of contribution, which is a sponsored decision, and that is exactly what Local 458 is. It was one of the original sponsors of the Interlocal Pension Fund back in 1950 and has remained so for the last 70 years. And it is entitled to establish the amounts that different groups within the local contribute to the fund. That is, I said sponsor. I meant settler. Excuse me. That was a settler function, and the law is very clear that there is no fiduciary obligation with respect to the establishment by settlers of how much they will contribute to the fund or for that matter what the benefits will be. And although it wasn't addressed by my colleague, it's important to note that the benefits in this fund are a function of how much someone has contributed. The trust document attached again as an exhibit to the appendix specifies that the amount a worker contributes during their entire career will be summed up at the end of their retirement. Let's say they contribute $50 a week for 30 years. That would yield $78,000 in contribution, and their monthly benefit would be 1.75% of that $78,000. A worker who had contributed $40,000 during the term of their participation in the fund would have that $40,000 multiplied by 1.75%. The reason for that is I wanted to make sure there was no confusion about whether the existence of different contribution rates imposed a burden on anyone. It does not. The people who contribute less than what the plaintiffs were contributing to the fund at 8% will receive a lower benefit. So the consequence of contributing at a lower level is felt by those members who contribute at the lower level, not the individuals who contribute at a higher level. The plaintiffs quote in their brief at page 15, and also identified in their complaint, the statement by the executive director of the fund to these plaintiffs that the contribution rate, and I'm quoting, is determined by local union bylaws, and the fund does not monitor or police the local union that only receives a list of participants and contribution rates from the union and accepts the union's word that all who are required to participate are doing so at the required rate. That is an accurate statement of the policies of the fund as developed by the trustees, and the reason it's important in this case is that there was never an assumption by the trustees of any obligation to monitor or enforce. There was never an assurance to anyone that that would be done, so that this is not an instance in which the trustee functions in the plan must also be interpreted in terms of the representations that have been made or relied upon or anything like that. The plaintiffs were told very specifically exactly what I'm telling you today, that the unions establish internally what the contribution rates will be. They can do that at different rates for different amounts within their union if they choose, and that is something the trustees leave to the settlers of this fund, namely those locals. There's also a reference in the briefs by the plaintiffs, although not made again here today, but just to address it, that the union disclaimer of interest in connection with the representation of these workers in this particular plant caused these plaintiffs to be automatically vested by the fund.  The fund did not take any action to vest the employees until they had lost their union membership. The consequence of losing union membership for any reason, whether someone quits, leaves, the shop goes out of business, or in this case the union disclaimed, means that the workers are vested under the terms of the plan. That was a decision made by the union, not by the fund, and the court below pointed out at page 14 of its decision that plaintiffs have not shown that the fund had anything to do with the decision to vest these employees other than to apply its usual rules when someone has lost union membership. There was a statement made by my colleague in his presentation that the trustees have a fiduciary duty to collect money that's owed to them. We do not deny that. We have every obligation to collect money that is owed to the fund. This case is about what is owed to the fund, and they've not demonstrated in any way that any participant who was required to participate at a higher rate, the trustees have not attempted to enforce that obligation. The unions enforced the obligation themselves, but there's not even an allegation here that there were some people that were required to participate at a higher rate that didn't do so. So the Diddick case and so forth, which involves trustees who did not collect contributions that were required to be paid under a collective bargaining agreement, is inopposite here. Trustees did not communicate that to the union, then? The trustees did not communicate that to the union, that they were not collecting enough? No, there's no allegation that that was made here, and it wasn't the case. We believe that the unions make, as settlers, good faith decisions about how much will be contributed by each group of members, and the union proceeds on that basis. Excuse me, the fund proceeds on that basis. The most that could be said for the interpretation, claims made by the plaintiffs, is that they might have created an ambiguity. And in our view, to the extent there was an ambiguity created, it was resolved by the trustees appropriately and pursuant to their authority under Article 10, Section 6 of the trust agreement. I'll just reiterate that as the court found below, at footnote 8, page 11, the trustees have no authority or obligation to enforce the local 458 bylaws, the union bylaws. What the court held was, quote, the finding that planned administrators may breach a fiduciary duty through actions of a non-fiduciary, in this case that would be local 458, would vitiate our requirement that a risk of claim of breach must be asserted against planned fiduciaries. And although they have asserted broadly that there was some breach by the trustees, of course, they haven't specifically identified what that was, or who was involved, or what it would have meant to the fund. There's simply no meaningful allegation of a fiduciary breach by the trustees in this case. If the court has no more questions, I will conclude my presentation. Thank you. Thank you, counsel. Mr. Kennedy again. It's an Irish town. Good morning. May it please the court, Wesley Kennedy representing District Counsel for and local 458 of the Teamsters Graphic Communications Conference, which are collectively the union in this case. The union is not a fiduciary of the fund. The union was the plaintiff's bargaining representative under the National Labor Relations Act, and for that reason was a settlor under ERISA, not a fiduciary. The union didn't exercise discretionary control over the plan's assets, but in its involvement in collecting and remitting contributions, and the union did not exercise control over the management of the plan when, under the labor laws, it disclaimed interest in representing the bargaining unit. The plaintiffs don't think the union represented them fairly in the collective bargaining agreement and in interpreting the union's constitution and bylaws. They wanted the union to change their contribution rate to the fund, in particular when the union was negotiating a new contract with the employer under the labor laws. The union's executive board, which has the authority to interpret and apply the bylaws, and the membership repeatedly rejected that request. Ultimately, when the union couldn't conclude a contract with the employer that was acceptable to the plaintiffs, the union disclaimed interest in continuing to represent the bargaining unit under the labor laws. The union had reason for doing everything it did, but that's beside the point for your purposes. All of this happened within the context of the union's relationship with the employees as their bargaining representative under the labor laws, not as a fiduciary of the fund under ERISA. The union was a settlor, not a fiduciary. With respect to the allegation that the union exercised discretionary control over the plan assets and its involvement in collecting and remitting contributions to the fund, in their briefs, the plaintiffs described this as controlling the amount of revenue that was used to finance the fund. And this morning, counsel for the plaintiffs said the issue here is the funding of the fund. That is clearly a settlor function, not a fiduciary function. Negotiating employee participation in the plan and the terms on which that's going to happen in a collective bargaining agreement is a settlor function, not a fiduciary function. And in particular, setting the contribution rates, determining what amount of money people are going to pay into the plan, determining the amount of revenue that's going to be received by the plan is a settlor function. And there's ample authority for that in this circuit and in other courts for those propositions. Plaintiffs' argument on this score depends on the assertion that the employee contributions to the fund are assets of the plan, and therefore under the union's control. But even under the plaintiff's theory, those contributions become plan assets in this case only when they are deducted from the employee's paycheck for forwarding to the fund. That's confirmed by the federal regulations that are cited in the plaintiff's brief at page 30. All of the cases cited by the plaintiffs on this score involve failure to remit contributions which have been agreed to in a collective bargaining agreement and or have been collected and are being held by the employer to forward to the funds. There are no cases cited involving the setting of contribution rates as a fiduciary act. Plaintiffs admit in their reply brief that they don't allege that the union's only involvement in collecting and remitting contributions to the fund once they're deducted from employee's paychecks is to collect the payments from the employer and then remit them on to the fund. That's a purely ministerial act, and the plaintiffs acknowledge that they do not allege that the union ever failed to timely remit contributions. That's in their reply brief at page 16. So that at the point in time when the union was doing things that the plaintiffs are concerned about, deciding who was going to be required to contribute how much to the plan, that was in a settlor function and as the bargaining representative of those various employee groups, not as a fiduciary of the fund. At the point in time when those contributions might have become assets of the plan, the union's role is purely ministerial and there's no allegation that the union failed to carry it out in a proper fashion. Now the plaintiffs try to get around this by saying the union selectively enforced the provisions of its bylaws. Regardless of what the proper interpretation of the bylaws is, and the executive board did that in this case, the court below properly found that that's just a repackaged way of saying the same thing. That determining how much money is going to be paid to the plan is a settlor function, not a fiduciary function. So the plaintiffs don't allege anything in the complaint that could constitute control over plan assets by the union. As for their second argument that the union unilaterally vested the plaintiffs in the fund when the union disclaimed interest, again the union was simply exercising an authority that's well established under the federal labor laws, the Hart's NLRB cases cited in our brief, which clearly gives even an incumbent bargaining representative the general right to choose to disclaim interest in representing a group of employees. Plaintiffs admit in their reply brief at pages 17 and 18, plaintiffs do not allege that the union did not possess the authority to disclaim interest in plaintiffs' bargaining unit. When it did that, the union wasn't exercising any authority over the trust indenture, it was exercising its authority as the bargaining representative to withdraw from the relationship. That has collateral consequences, as the other Kennedy explained. When somebody ceases to be an active member of the union and actively employed in a participating employer, the consequence is that the employee moves from active status to vested status under the terms of the plan. That doesn't make the union a fiduciary in this case, as the court properly found at page 14 of its decision. If the plaintiffs were right about this, if the union acted as a fiduciary of the fund when it exercised its labor law right to stop representing them, there are lots of other things that would make people fiduciaries. If the employee resigns, that has the consequence of the employee no longer being an active participant in the fund and the employee becomes vested. That doesn't make the employee a fiduciary of the fund.  that has the consequence of making the employee a vested participant because they're no longer active. That doesn't mean that the employer was acting as a fiduciary when it fired the employee. If the union chooses not to arbitrate that employee's grievance under the collective bargaining agreement when he's terminated, the consequence is the employee is no longer active and he becomes a vested participant in the fund. That doesn't mean the union was acting as a fiduciary when it decided whether to arbitrate the grievance or not. If the company closes the plant, if the company makes the management decision to close the plant, that might raise some issues under the labor laws of the union, but the fact that that has the collateral consequence of moving all of the employees out of active status and the vested status of the fund doesn't mean that the employer's decision to close the plant is somehow subject to the fiduciary liability standards of ERISA. So the plaintiffs haven't pleaded anything on the second argument, either, that the union exercised any control over the management of the plant when it disclaimed interest. As I said when I started, the plaintiffs' real argument is they don't like the way the union represented them. If that was a valid claim, and we don't think it would be, that would be a claim under the duty of fair representation under the labor laws, that the union failed to fairly represent them as the bargaining representative. The problem with that from the plaintiff's standpoint is that that carries a six-month statute of limitations under the Supreme Court's Del Castello decision, so plaintiffs didn't file this lawsuit until 16 months after the union disclaimed interest. So a claim for the breach of the duty of fair representation was clearly time-barred, which I think is why this got repackaged before the court below and before you as a claim that the union was somehow a fiduciary of the fund. But the plaintiffs haven't pleaded anything in the complaint that would make the union anything other than a settlor of the fund for purposes of ERISA. They haven't pleaded anything that would make the union a fiduciary. And for that reason, we believe the court below acted properly in dismissing the complaint and we ask you to affirm the court's judgment with respect to the union. If there are no questions, I'll sit down. I don't believe so. Thank you. Good morning. First, I would like to address the last issue raised by the union. They create an argument here that the plaintiffs are somehow unhappy with your union representation and they should have taken a different tact. That's completely unrelated, unresponsive. It's not supported by any documents. I really don't think that's a credible argument. Next, I'll move on to some of the points the trustees made. The trustees stood here and they admitted that they didn't have any role in collecting these contributions. My counsel for the trustees stated that I represented that the union bylaws are governing documents. That's incorrect. The record will show that's incorrect. I only mentioned the 14.2B, the union bylaw and the summary plan description that they corroborated the actual language that's at issue here, Article 4, which is in the trust adventure, which is a governing document. That's the root of this case. Article 3, Section 2, again, only responds to participation. It only addresses participation, not contribution. Article 4.1C states, and I will read it into the record, quote, any group of participating members and participating local made by official action of its membership and upon prior approval of the trustees of the interlocal pension fund determined that the contributions of its members shall be greater than the amount specified in Section B above providing that the formula for such greater contribution shall apply to all participating members of the local, end quote. And that can be found in Document 4, Exhibit A of the trust at page 27. So what does Article 4.1C tell us? It tells us that all this obfuscation about who sets the rates, the rates were set and it's admitted in their answer and it's not contested that in 2008 the members facing shortfalls in their fund were told we need to increase contributions. And the local membership, and that's how it reads in the complaint, that's how they answered, the members voted to increase to 8%. So it's at 8%. And what else do we have? We have an allegation in the complaint, verified by their answer, that there is, in fact, a company that's local 458 members and they're not paying at 8%. They originally paid at $10 and then that was increased. So the evidence on the record completely destroys their argument that there's some type of dispute about who sets the contributions or if it's a settler function or not. The plaintiffs allege the rate was set, they were not gathering it. The trustees admitted that they abdicated all this responsibility to the union. A trustee can't do that. They have a duty to gather what's owed to the fund. That's why we believe Direct is one of the cases that's very instructive here. They're relying strictly on the union to say who contributes at what rates and how. They don't even know how the money is coming into the fund. They're just taking the union's word for it. So it's clear that the facts, as alleged,  The argument about their segments or groups, that doesn't even come into play. That's their defense. That's mentioned twice. There's nothing in the record that when they voted to increase to 8%, it only applied to certain segments, it only applied to certain groups. Where's the evidence? Because it applied to the membership and they admitted it applied to the membership. So to allow the trust in the union to both state that there's discretion to interpret this and set the terms, the terms are clearly set. They were set and they were admitted to. Lastly, the union can't decide. They stated, they decided who could or how much they could contribute. Because that's the trustee's job. And that's governed by Article 4, which stated if there was an increase in contribution, that rate has to be applied across the board. If there's no further questions, I'll rest. I don't think so. Thank you, counsel. Thanks to both counsel and the case is taken under advisement.